LAND, J.
Plaintiffs, the father and mother, sued for $32,000 damages for the death of their son, nearly 3% years of age, who on August 20, 1912, while standing on the railroad track at a private or farm crossing, was killed by a fast cannon ball passenger train of the defendant company.
Plaintiffs’ statement of the case in their brief is as follows:
“The child was standing upon a public crossing, across the railroad track of the defendant company, in plain view for at least 1,400 feet, looking from the east towards the west, the direction from which the train was coming.
“Defendant’s answer is that the child was seen by the engineer immediately on rounding *4 the curve, and that the engineer did everything possible to stop the train.
“From the time the engineer could see the child on the crossing, the train ran over 2,000 feet before it was brought to a standstill, approximately 1,400 feet before it hit the child. The child was knocked 76 feet down the track to one side.”
“The maximum speed provided for this tram was 32 miles an hour. Between no stations had it made more than 32 miles an hour on the day of the accident as shown by the official returns of the engineer as to the time made.
“The defendant further alleges that the child killed was suffering with hydrocephalus, and that this fact should minimize the damages, in fact should reduce them to an insignificant sum.
“Upon these issues the case was tried by a jury of competent men, residents of Bienville parish, La.,, and a verdict rendered in favor of plaintiffs for $12,500. The defendant appealed, and the plaintiffs have answered the appeal and pray that the judgment be amended by allowing interest from the date of the judgment.”
Defendant’s statement of the case in its brief is as follows:
“During the noon hour of August 20, 1912, on a fair day, the plaintiffs permitted their afflicted child 3% years of age, to wander onto the track of the defendant at this farm crossing. There was no' explanation of why the child was on the tracks, but we assume that, the house being only a short distance from the railroad, according to the statement of the plaintiff 300 steps, and the view being obstructed by a cornfield, while the father was resting and the mother engaged with the preparation of the noon meal, the unfortunate child wandered away without the knowledge of any one.
“Defendant’s heavy cannon ball train, going west at the rate of speed from 40 to 52 miles per hour, at a safe distance from this farm crossing, gave the usual signal of its approach, viz., four blasts of the whistle. There was a considerable curve and a long cut just east of the crossing, and from the time that the child could be seen from the engine cab it was a downgrade of 8/io or 1 per cent., the maximum grade of the railroad, east of the city of Shreveport. The engineer was keeping a sharp lookout for the crossing and as soon as the engine turned the curve he discovered the child standing on or near the north rail of the track. The train was equipped with all modern appliances, and as soon as the presence of the unfortunate child was known, or could be known, the engineer sounded his alarm whistle, cut off his steam, applied his emergency brakes, sanded the tracks, and continued to sound the alarm whistle, but to no avail.
“The child, with his tender years and physical affliction, never appreciated the danger, and never moved. He was struck by the engine or pilot, carried along the railroad track some 30 or 40 feet, and rolled over the embankment; the rear cars of the train, notwithstanding the efforts of the engineer, cleared the crossing before it was brought to a standstill.
“Among other injuries received by the child, his skull was crushed, and he was unconscious and beyond the reach of pain from the moment he was struck until his death.”
Counsel for the plaintiffs state in their brief:
“Our contention is that the engineer saw the little boy and knew his peril in' ample time to have stopped the train before reaching the child, and that he negligently failed and neglected to do so. This point is the real gist of the case and must be determined from the facts as gleaned from the evidence.”
The jurisdiction of this court over the facts makes it our duty to review the verdict and judgment on the evidence in the record.
Defendant’s statement supra contains a fair narration of the actions of the engineer of the train at the time of the accident. His testimony shows that on rounding the sharp curve, he saw the crossing, and the child standing thereon, and at once shut off the steam, applied the emergency brakes, and sounded the alarm whistle. He also sanded the tracks. He kept sounding the whistle, until within a few feet of the child, who never moved from his position on the crossing. He testified that at the same rate of speed he could have stopped his train on a level within about 1,200 feet, but on the occasion in question his train was moving down grade.
A civil engineer, witness for the plaintiffs, testified that the child could have been seen on the crossing at a distance of 1,400 feet. The same witness, at the request of defendants, made an actual test from the cab of a standing locomotive, and found that the crossing was not visible at a greater distance than 1,170 feet. The witness was fair enough to admit that defendant’s engineer on the rapidly moving train, rounding the curve, might not have been able to see the crossing at a distance of 1,170 feet.
The defendant company had a test made *6 by 0. O. Meadows, one of its most experienced engineers, to ascertain whether the train, which ran over the child, could have been stopped short of the crossing. Under similar conditions, duplicated as near as possible, Meadows, as soon as he could see the crossing, shut off the engine and applied the emergency brakes, but despite all his efforts the rear car of the train went about a car length beyond the crossing. The testimony of Meadows is corroborated by that of the superintendent of the defendant company, and of another witness, both participants in the test.
The following question was propounded to Mr. Meadows:
“Q. Now then with a passenger train of the weight of this, with this engine No. 305, down that grade, running say 40 to 50 miles an hour, at the top of the grade on a dry day, within what distance is it possible to bring your train to a standstill? A. Something like 1,200 or 1,-400 feet.”
The same witness testified that a similar train, running at 30 to 50 miles an hour on a level track, could be stopped in about 700 to 900 feet; that the grade at the crossing was about the maximum grade of the road; and such a grade would make a difference of from 200 to 400 feet in the stop.
Mr. Hearn, the superintendent, testified that a speed indicator which he held before him showed that, at the moment the crossing came into view, the train was running 42 miles an hour, and was running 18 miles an hour when it reached the crossing. The intelligence and good faith of the three witnesses are not questioned.
Four engineers of long experience in running passenger locomotives corroborate the testimony of Meadows as to the distance in which the train could have been stopped on the occasion in question.
Stumpt, of the Kansas City Southern, said within from 1,250 to 1,400 feet, when the speed was from 40 to 46 miles an hour. The witness described several emergency stops which he had made, and stated that it would take - from three to six seconds for an experienced engineer to detect an object on the track and to effectually apply the emergency brakes. The witness further stated that if the engineer was running 45 miles an hour, he would be going at the rate of 66 feet per second, and it would take him as much as five seconds to realize that it was necessary to set the brakes and to set them. The same witness testified that it would be impossible to stop a train within 1,170 feet under the conditions under which defendant’s train was operated at the time of the accident.
Willis, of the Louisiana' & Arkansas Railway Company, related three emergency stops he had made, and stated that on the occasion in question a stop within 1,170 feet was impossible. This witness said:
“There is no stop that can be figured with mathematical certainty until after the stop has been made, as the value of the coefficient friction is an uncertain quantity, but in the average operating condition this stop should he made in from 1,350 to 1,500 feet.”
Jordan, of the Texas & Pacific, and Beau, of the Louisiana' Railway & Navigation Company, testified to the same effect.
Plaintiffs’ counsel asked the engineers called as' witnesses on their side the following question:
“Q. From your practical experience as an engineer, in what distance could a train of seven cars, running from 35 to 40 miles an hour, be stopped, that was equipped with modern air brakes and sand, as it comes to the top of an ascending grade 3,000 feet in length, by the application of the emergency brake, the track being dry and all in first class condition?”
The question was answered by the respective witnesses, as follows:
J. L. Dalton: “380 to 500 feet.”
A. McDermitt: “400 to 500.”
T. P. Hamilton: “300 to 450.”
L. O. Clyde: “300 to 450.”
Thornton Howitt: “450 to 500.”
Courtney Brice: “500 to 600.”
W. C. Hanie: “Within 700 feet easily.”
*8 It is to be noted that the question calls for an average speed of 37% miles an hour, when the direct testimony of the engineer in charge of the train at the time of the. accident calls for an average of 42% miles an hour. Nor does the question indicate the degree of the descending grade from the top.
None of the seven engineers except Hanie appear to have been experienced in running fast passenger trains or in making emergency stops, and in fact three of them had never operated a passenger train.
Plaintiffs next introduced the scientific testimony of three witnesses to fix the distance within which the train in question could have stopped on the occasion of the accident.
Mr. Atkerson, professor of physics and electrical engineering, and dean of the College of Engineering, expres'sed the opinion that the train, at 40 miles an hour, could have been stopped within 400 feet, and at 45 miles an hour, within 510 feet. The witness, however, does not explain the process by which he reached his conclusion. Mr. Ramsey, mechanical engineer and superintendent of railroad tests, makes á distinction between a “high-speed” brake and a “quick-action” brake, and said that the train in question at 40 miles an hour could have been stopped with “high-speed” brake in 480 feet from point of application, and with “quick-action” brake in 600 feet. This witness stated that he had never worked as a locomotive engineer on any railroad.
Mr. Ramsey, and we presume, Mr. Atkerson also, figured from the “point of application,” and did not include the distance traversed by the locomotive between the moment of the discovery of the object on the track and the application of the brakes. In the case at bar such distance may have been more than 300 feet.
Mr. Frank Bogart, superintendent mechanical engineering course, at Louisiana Industrial Institute, Ruston, La., in answer to a question similar to the one propounded to Mr. Ramsey, said that at 40 miles an hour the train could have been stopped. within 197 82/ioo feet, and at 45 miles ah hour, within 250 82/ioo feet, and at 50 miles an hour, within 309 feet.
This radical disagreement among the scientists impairs the force and effect of their testimony.
The question before the court is not one of science or mathematics, but whether Watts, the engineer of the defendant, was guilty of negligence in the operation of the train on the occasion in question.
Watts’ testimony relieves him of the imputation of neglect, and the truth of his testimony is confirmed by the subsequent careful test made by Engineer Meadows under the direct supervision of Mr. Hearn, the superintendent of the company. The correctness of the test is supported by the positive testimony of four engineers of long experience in the passenger service, which is controverted by only one engineer of like experience.
In Manning v. New Orleans Great Northern Ry. Co., 135 La. 11, 64 South. 925, a freight train, speeding at the rate of 20 or 25 miles an hour, ran over and killed a child, 26 months old, who was asleep on the track between the ties. In that case, the engineer testified that he was keeping a lookout, and as soon as he saw that the object was a child, shut off steam, applied the emergency brakes, etc., but could not stop the train in time to avert the tragedy. An actual test, made under the direction of the trainmaster, showed that the child was not recognizable at a greater distance than 500 feet, and he and the engineer testified that it would have taken about 1,000 feet to stop the train. This court said in part:
“We must view this case from the standpoint of Merritt, the engineer, who had not the *10 slightest reason to anticipate that a child was sleeping on the track in front of him. * * _ * That the engineer should have seen the_ child in time to have prevented the accident is not shown by the evidence. The negligence, if any, was on the part of the custodians of the child.
“The burden of proof was on the plaintiffs to prove * ♦ * that Merritt, the engineer, was negligent. We are satisfied that they have failed to discharge that burden.”
The judgment was reversed, and the suit was dismissed.
So we say in this case that the burden was on the plaintiffs to prove with legal certainty that Watts, as a careful and prudent engineer, should have stopped the train in time to have saved the life of the child on the crossing.
Plaintiffs, primarily at fault for not looking after their child, have, in our judgment, failed to prove that its death was occasioned by the fault of the engineer.
It is therefore ordered that the verdict and judgment below be avoided and reversed, and it is now ordered that plaintiffs’ suit be dismissed, with costs.